******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

BISHOP, J., dissenting. In this premises liability action involving serious physical injuries, the plaintiff, Daniel Klein, asserts two claims on appeal: first, that the trial court abused its discretion by permitting a witness to give opinion testimony without adequate foundation, and second, that the court improperly refused to instruct the jury on the definition of and duties owed to a licensee upon a possessor's land. The majority concludes that the court properly refused to give such instruction. Alternatively, the majority concludes that, even if the court's instruction was incorrect, the error did not harm the plaintiff. The majority therefore finds no reversible error in the court's instruction to the jury and, consequently, concludes that the plaintiff's evidentiary claim is barred by application of the general verdict rule. I respectfully disagree.

A pivotal issue at trial was the legal status of the plaintiff on the property of the defendant, Quinnipiac University. The plaintiff asserted that he was there with the permission of the defendant; the defendant claimed, in response, that the plaintiff was a mere trespasser. The trial court determined, as a matter of law, that the plaintiff was a trespasser and, therefore, declined to instruct the jury with respect to the duties owed to licensees. I conclude that this was reversible error. In my view, there was adequate evidence adduced at trial for the jury to conclude that the plaintiff had entered the defendant's property with the defendant's implied permission, and, accordingly, the trial court erred in refusing to give the requested licensee instruction.[1] In doing so, the court, in essence, directed a verdict against the plaintiff, thereby denying him the opportunity to have his claims fairly decided by a jury of his peers. In my view, this instructional error necessarily prejudiced the plaintiff and, therefore, requires reversal and an order remanding the matter for a new trial. Because the issue of the admissibility of the opinion testimony regarding the plaintiff's speed may arise on retrial, I would also reach the plaintiff's evidentiary claim and conclude that this lay opinion testimony was improperly admitted because the witness rendering the opinion lacked an adequate factual foundation.

The underlying facts, which the jury reasonably could have found, are, in the main, undisputed, with one exception regarding the purpose of a guardhouse on the defendant's premises. On July 30, 2014, the plaintiff and a friend, Richard Lebov, both experienced bicyclists, went for an extended bicycle ride that ended on the defendant's York Hill campus in Hamden (campus), which, being situated on a hill, provides a nice view of New Haven and Long Island Sound.[2] The plaintiff and Lebov entered the campus via an access road from

Sherman Avenue and proceeded onto the campus. At the time in question, this entrance was not gated, and there were no "no trespassing" signs posted anywhere around the campus or any other signs indicating that access to the campus was restricted in any way. In short, the circumstances were such as to lead a reasonable person approaching the entrance to the defendant's campus from Sherman Avenue to believe that the premises were open to the public without restriction.

The access road from Sherman Avenue terminates well into the interior of the campus, where it intersects with another campus road. At this point, lane use arrows in the right travel lane of the access road indicate that traffic may either proceed straight or turn right. Both routes lead to the top of the campus, where several dormitories and a student center are located. The plaintiff and Lebov turned right at this intersection to continue their ride to the top of the campus.

Across from the intersection at which the plaintiff and Lebov turned right is a road that leads directly to the dormitory area of the campus. Situated at the entrance to this road, in the median, is a guardhouse staffed at all times by a public safety officer. The guardhouse is flanked on both sides by two yellow painted speed bumps. A sign posted on the front of the guardhouse states that "all vehicles must stop and be registered." It is noteworthy that the sign at the guardhouse was directed only to vehicles and that, at the time in question, there were no signs posted requiring that users of the roadway coming from the Sherman Avenue entrance proceed across the intersection to the guardhouse instead of turning right as did the plaintiff and Lebov.

The route to the right of the intersection, taken by the plaintiff and Lebov, leads past a wind farm before connecting with the other end of the guardhouse road at the top of the hill. As with the Sherman Avenue entrance and the access road, there were no signs restricting traffic from taking the road leading past the wind farm. Nor were there any signs posted indicating that this road was one-way or that bicyclists or pedestrians using the road were going against the flow of traffic. Although there was a vertical swing arm gate located at some point along this road, the arm was in the upright position at the time in question. The open position of the gate's arm certainly does not suggest that travelers, be they students, staff, or visitors on that road, were unwelcome.

When the plaintiff and Lebov reached the intersection and turned right along the road up the hill toward the wind farm,[3] the safety officer on duty, Juan Melendez, observed them but remained inside the guardhouse. Also, he did not attempt to alert the other officer on duty to their presence. This inaction by Melendez supports the plaintiff's view that it was not part of Melen-

dez' duty to screen, generally, visitors to the campus who did not seek access via the guarded roadway to the dormitories. Indeed, when the plaintiff and Lebov had taken a bicycle ride along a similar route on the campus the previous year, no one had attempted to stop them, and there had been nothing to suggest in any manner that their presence had been unwelcome.[4]

After a minute or two, Melendez exited the guardhouse to survey the area, as he was expecting to see the plaintiff and Lebov come back. While standing in front of the guardhouse surveying the area, Melendez "heard a noise" and "instinctively" turned to his right, whereupon he observed the front wheel of the plaintiff's bicycle hit the second speed bump, causing the plaintiff to be thrown into the air over his handlebars and to hit the ground. The plaintiff sustained serious physical injuries as a result.[5]

The plaintiff commenced the present action by service of process on the defendant on March 11, 2015. In the operative second amended complaint filed on October 24, 2017, the plaintiff alleged that the bottom most speed bump in the egress lane of the guardhouse road was in a dangerous, defective, and unsafe condition and that he had been injured as a result of the defendant's negligence in allowing this dangerous condition to exist, failing to inspect the speed bump to ensure that it was in a reasonably safe condition, failing to remedy the condition, and failing to warn of the condition.[6] The defendant denied the plaintiff's allegation of negligence and raised the special defense of contributory negligence. The matter was tried to a jury beginning on April 16, 2018, but no interrogatories were submitted to it.

At trial, Melendez testified that he had not seen the plaintiff coming down the hill prior to the plaintiff's collision with the speed bump. Nevertheless, he was permitted to testify, over the objection of the plaintiff's counsel, as to his opinion that the plaintiff's speed going down the hill was ten miles per hour, conservatively. This estimate was in line with that provided by the defendant's expert witness, Christopher Juliano, who opined that the plaintiff had been traveling at approximately 9.8 miles per hour at the time the accident occurred.

Following the conclusion of the defendant's case-in-chief on April 19, 2018, the defendant moved for a directed verdict. During argument on the defendant's motion, the defendant's counsel argued that the only conclusion that could be reached on the basis of the evidence presented was that the plaintiff had been a trespasser and that, consequently, the only duty that the defendant owed was to refrain from intentionally or recklessly injuring the plaintiff. The defendant's counsel, therefore, contended that, because the plaintiff did not allege or prove that the defendant had intention-

ally or recklessly injured him, he could not prove negligence.

The plaintiff's counsel countered that there was ample evidence to support a conclusion that the plaintiff had been a licensee, which he defined as "a person who is privileged to enter or remain on land only by virtue of the possessor's consent, that is with the possessor's permission or with the possessor's expressed or implied consent." More specifically, the plaintiff's counsel argued that the evidence demonstrated that the plaintiff had had the implied consent of the defendant to be on the campus. In support of this argument, the plaintiff's counsel pointed to the following evidence: the lack of any "no trespassing" signs, the lack of any signs restricting access to the campus to any particular categories of people, the lack of any signs directing visitors to stop at the guardhouse to sign in, the arrows on the street pointing in directions away from the guardhouse, the upright position of the arm of the gate along the road leading past the wind farm, Melendez' testimony that visitors without any affiliation with the defendant were generally permitted unless they appeared suspicious, and the lack of any gate at the entrance to the campus.[7]

Although the plaintiff had been proceeding under a theory of implied consent, the court, without explanation, proceeded to summarize the law concerning implied *invitations*. Citing the second edition of American Jurisprudence, the court stated: "An invitation may be implied from dedication, customary use, or enticement, allurement, or inducement to enter [or] manifested by an arrangement of the premises or the conduct of the owner or occupant . . . ." See 62 Am. Jur. 2d 464, Premises Liability § 92 (2018). The court went on to note that this was consistent with Connecticut case law indicating that, for the plaintiff to constitute an *invitee*, "it must appear that [the plaintiff] was expressly or impliedly invited to use the defendant's premises," which, according to the court, "[was] not the case here." Nevertheless, the court deferred ruling on the defendant's motion for a directed verdict and immediately moved on to a charge conference.

During the charge conference, and in spite of the plaintiff's unequivocal statement that he was claiming to have been a licensee and his explicit disavowal of any claim of invitee status, the court framed the issue regarding the appropriate jury charge in terms of "whether there was an implied *invitation*," citing the principles it had previously noted in the context of the defendant's motion for a directed verdict. (Emphasis added.) The court concluded that, "considering [those principles], the charge . . . [that] is going to be giv[en] is [the] trespasser charge only . . . ."

Following trial, the jury returned a general verdict in favor of the defendant, and the court rendered judgment

accordingly. This appeal followed.

I first address the plaintiff's claim that the trial court erred in refusing to instruct the jury regarding the definition of a licensee and the duties owed to a licensee by a possessor of land. The plaintiff argues that the trial court improperly conflated the concepts of implied invitation and implied consent and that there was sufficient evidence to support a finding that he had entered the campus with the defendant's implied consent. The plaintiff, therefore, contends that it was an abuse of discretion for the trial court to refuse to instruct the jury on the definition of and the duties owed to a licensee. The plaintiff further argues that the court's error was harmful because it was tantamount to directing a verdict in favor of the defendant. More specifically, the plaintiff contends that, without a licensee instruction, the jury was left with no choice but to find that he was a trespasser to whom the defendant owed a duty only to refrain from intentionally or recklessly injuring the plaintiff. I agree with the plaintiff.

"A licensee is a person who is privileged to enter or remain upon land by virtue of the possessor's consent . . . ." (Internal quotation marks omitted.) *Laube* v. *Stevenson*, 137 Conn. 469, 473, 78 A.2d 693 (1951), quoting 2 Restatement (First), Torts § 330 (1934). Although such consent may be given by invitation—i.e., "conduct [that] justifies others in believing that the possessor *desires* them to enter the land"; (emphasis added) 2 Restatement (Second), Torts § 332, comment (b) (1965); mere "permission"—i.e., "conduct justifying others in believing that the possessor is *willing* that they shall enter if they desire to do so"; (emphasis added) id.; will suffice. See *Corcoran* v. *Jacovino*, 161 Conn. 462, 466, 290 A.2d 225 (1971) ("[m]ere permission, as distinguished from invitation, is sufficient to make [a] visitor a licensee"). As the majority correctly acknowledges, the great weight of authority indicates that such invitation or permission may be given either expressly or implicitly.

In the present case, there was no evidence adduced at trial of the defendant's having explicitly or implicitly expressed a desire that the plaintiff enter its campus, nor was there any evidence of the defendant's having explicitly expressed a willingness that the plaintiff enter. Accordingly, I agree with the majority that the jury reasonably could not have found the plaintiff to be a licensee by virtue of any express or implied invitation or by an express grant of permission. I disagree, however, that there was insufficient evidence to support a finding that the defendant had tacitly permitted the plaintiff to enter the campus.

As the majority notes, our appellate case law provides little insight as to the proof necessary to establish licensee status by implied permission. I therefore agree that, in such circumstances, it is appropriate to look to

the Restatement for guidance. The commentary to § 330 of the Restatement (First) of Torts provides that, "[a]s in all cases in which one person's consent is important as affecting the legal relations between him and another, it is the *manifestation* of consent which is decisive and not the state of mind which the possessor intended to express." (Emphasis added.) 2 Restatement (First), supra, comment (c), p. 894. In other words, "the decisive factor is the interpretation which a *reasonable man* would put upon the possessor's acts"; (emphasis added) id., comment (d), p. 894; not the possessor's unexpressed intentions or policies.

"In determining whether a particular course of action is sufficient to manifest a consent to enter the land, regard must be had to all the surrounding circumstances." Id. For example, "[i]f a railway company prepares a paved or boarded path between the two platforms of its station, it may or may not give passengers reason to believe that the pathway is prepared for their use. If there is no other means of communication provided between the two platforms, a passenger may reasonably believe that the path is meant for his use. On the other hand, if there is an overhead bridge or a subway plainly visible, even though the pathway is not blocked by a fence or railing, the passenger might not be justified in regarding the path as prepared for him." Id., pp. 894–95.

"In determining this regard is to be had to customs prevailing in the community. The well-established usages of a civilized . . . community entitle everyone to assume that a possessor of land is willing to permit them to enter for certain purposes until a particular possessor expresses unwillingness to admit them. . . . [For instance] if there be a local custom for possessors of land to permit others to enter it for particular purposes, residents in that locality and others knowing of the custom are justified in regarding a particular possessor as conversant with it and, therefore, in construing his neglect to express his desire not to receive them as a sufficient manifestation of a willingness to admit them."[8] (Internal quotation marks omitted.) Id., p. 895.

Applying these principles in the context of the case at hand, it is plain that there was sufficient evidence adduced at trial to reasonably support a finding that the plaintiff had been a licensee by virtue of the defendant's implied permission. As noted, at the time in question, the Sherman Avenue entrance to the campus was not gated, and there were no "no trespassing" signs posted at the campus entrance or any signs signifying that presence on the campus was restricted in any manner or to any category of individuals. Although one of the roads leading to the dormitories at the top of the campus was guarded by a guardhouse, the other route to the top of the campus taken by the plaintiff was not

guarded, and the lane use arrows on the access road from Sherman Avenue suggested that entrants could utilize this other route rather than the guarded road. Additionally, there was no evidence of any signs along the route taken by the plaintiff restricting access to the top of the campus to certain categories of people. Moreover, Melendez' testimony that he took no action to limit or even question the plaintiff upon seeing him turn right at the intersection, or to seek assistance from the other safety officer on duty elsewhere on the campus, supports the conclusion that the plaintiff's presence on the campus was permitted. Finally, given the plaintiff's testimony that he had taken the same route to the top of the campus the previous year without any interference from the defendant's agents, the jury reasonably could have concluded that the prevailing custom on the campus was to permit individuals not associated with the defendant to enter the campus and to ride, without restriction or interference, to the top of the campus to enjoy the vista it affords.[9] Given this evidence, I have little difficulty in concluding that a properly instructed jury could have determined that a reasonable person in the plaintiff's position justifiably would have inferred from the surrounding circumstances that the defendant was willing to allow the plaintiff to enter the campus and to proceed along the route he took leading past the wind farm to the top of the campus.

The majority's conclusion to the contrary is, in my view, flawed. Preliminarily, I note that the majority appears to accept that, *in some circumstances*, the lack of gates and "no trespassing" signs, without more, may be sufficient to establish implied permission. See 2 Restatement (First), supra, § 330, comment (b), p. 893 ("[a] mere failure to object to another's entry may be a sufficient manifestation of consent thereto if the possessor knows of the other's intention to enter and has reason to believe that his objection is likely to be effective in preventing the other from entering").[10] Thus, the majority's position appears to be that there are additional circumstances in the present case that render the lack of such signs and gates insufficient to establish the plaintiff's status as a licensee. Although the majority does not state explicitly what these additional circumstances are, it appears to rely heavily, if not exclusively, on the fact that the plaintiff did not stop at the guardhouse that straddled the road leading directly to the dormitories at the top of the campus and, instead, took the route to the top of the campus that leads past the wind farm. Ostensibly, the majority interprets the presence of the guardhouse as a manifestation of the defendant's unwillingness to permit persons who are not affiliated with the defendant and have not checked in at the guardhouse to enter into the top of the campus. I respectfully disagree with this interpretation.

Although there was a sign posted on the front of the

guardhouse stating that "all vehicles must stop and be registered," there were no signs stating that people coming into the campus by other means—for example, by foot or on bicycle—must also check in at the guardhouse before going to the top of the campus. Nor were there any signs requiring that entrants to the top of the campus utilize the guardhouse road rather than the road that leads past the wind farm. Given these circumstances, a reasonable person in the plaintiff's position may well have concluded that the only apparent purpose of the guardhouse was to limit vehicular access to the road that it guarded and that the presence of the guardhouse therefore had no bearing on the defendant's willingness to allow individuals without vehicles to proceed along the route traveled by the plaintiff to the top of the campus.[11]

I also respectfully disagree with the majority's speculative assertion that, if this court were to conclude that the plaintiff in this case was a licensee, it essentially would require much, if not all, private property to be fenced, gated, and covered with "no trespassing" signs in order to avoid conferring licensee status on mere trespassers.[12] As previously noted, whether an entrant constitutes a licensee is a *fact specific* inquiry that requires due consideration of *all of the surrounding circumstances*. See 2 Restatement (First), supra, § 330, comment (c). Thus, my conclusion that the lack of "no trespassing" signs and gates was sufficient to warrant a licensee instruction under the particular factual circumstances of the present case cannot reasonably be construed as an indication that, in all premises liability cases, the lack of such signs and gates renders an entrant a licensee as a matter of law.

In sum, I conclude that the trial court erred in refusing to instruct the jury on the definition of and the duties owed to licensees. As the majority correctly notes, however, "before a party is entitled to a new trial [due to an error in the trial court's jury instructions] . . . he or she has the burden of demonstrating that the error was harmful." (Internal quotation marks omitted.) *MacDermid, Inc.* v. *Leonetti*, 328 Conn. 726, 749, 183 A.3d 611 (2018). In the present case, the plaintiff argues, in essence, that the court's refusal to provide the requested licensee instruction was harmful because "[i]t was tantamount to directing a verdict for the defendant . . . ." I agree.

The record reveals that there was no evidence presented at trial to indicate that the defendant had intentionally injured the plaintiff or that it had engaged in wilful, wanton, or reckless conduct so as to make it liable for injuries to a trespasser. See *Maffucci* v. *Royal Park Ltd. Partnership*, 243 Conn. 552, 558, 707 A.2d 15 (1998) ("a possessor of land is under no duty to keep his or her land reasonably safe for an adult trespasser, but has the duty only to refrain from causing injury

to a trespasser intentionally, or by willful, wanton or reckless conduct" [footnote omitted; internal quotation marks omitted]). Consequently, the trial court, by improperly instructing the jury only with respect to the duties owed to trespassers, effectively directed a verdict in the defendant's favor.[13] In my view, this necessarily harmed the plaintiff because it deprived him of a fair opportunity to have the jury carry out its constitutional fact-finding function and determine his claims on the basis of correct legal principles.[14] See *Tryon* v. *North Branford*, 58 Conn. App. 702, 716, 755 A.2d 317 (2000) (whether there was breach of duty of care is question of fact to be decided by jury after considering credibility and weight to be accorded evidence). I respectfully disagree with the majority's conclusion to the contrary.

The majority also asserts that there was insufficient evidence presented at trial to support a finding that the defendant breached any duty owed to the plaintiff as a licensee and that, therefore, any error in failing to provide the requested licensee instruction was harmless. As the majority correctly notes, a land possessor who actually or constructively knows of a licensee's presence on the premises must use reasonable care to warn the licensee of dangerous conditions on the land that the possessor knows of but that the possessor cannot reasonably assume the licensee knows of or by reasonable use of his or her faculties would observe. See *Morin* v. *Bell Court Condominium Assn.*, *Inc.*, 223 Conn. 323, 327, 612 A.2d 1197 (1992). The majority notes that speed bumps in general are a known hazard to bicyclists and that the particular speed bump at issue in the present case was plainly visible to the plaintiff. Accordingly, it concludes that the plaintiff knew or had reason to know of the speed bump and the risk involved in riding his bicycle over it.

Respectfully, I believe this conclusion to be premised on a fundamental misunderstanding of the nature of the plaintiff's claim.[15] The majority construes the plaintiff's claim to be that the defendant's premises were in a dangerous condition by virtue of the mere existence of the speed bump. The plaintiff made no such claim. Rather, the plaintiff alleged in his complaint, and offered evidence at trial to prove, that the *improper manner* in which the speed bump was *constructed* rendered the premises dangerous. Specifically, he claimed that the speed bump was defective in that "the height of the downhill side of the . . . speed bump was [five] inches above grade, whereas the uphill height of the speed bump was [one and five-eighths] inches above grade; the speed bump profile was not uniform; the transition from [the] speed bump to [the] roadway surface was not smooth; [and] the speed bump, with its downhill height of [five] inches, was unreasonably high for a road with a 10 [percent] downhill grade." Given the technical nature of these alleged defects, the jury rea-

sonably could have concluded that they would not have been obvious to the plaintiff, even if the speed bump itself was plainly visible to him as he was riding down the hill. Moreover, although there was no evidence presented that the defendant had actual knowledge of the defective condition of the speed bump, the around-the-clock presence of a safety officer at the guardhouse, which is adjacent to the speedbump, is sufficient, in my view, to charge the defendant with such knowledge.

In sum, I conclude that the trial court's refusal to give the plaintiff's requested licensee instruction and its decision to instruct only on the duties owed by a possessor of land to a trespasser constitutes reversible error. Because this error left the jury with no "untainted" route to the verdict, I do not find the general verdict rule applicable in the present case. See *Cavaliere* v. *Olmsted*, 98 Conn. App. 343, 347–48, 909 A.2d 52 (2006) (holding that general verdict rule did not apply because, even if this court assumed that jury rejected plaintiff's allegations of negligence *and* found him contributorily negligent, *both* of those determinations were undermined by trial court's failure to instruct jury regarding proper standard of care, and, therefore, there was no "untainted route" to verdict); *Monterose* v. *Cross*, 60 Conn. App. 655, 661, 760 A.2d 1013 (2000) (same).

Because I would reverse the judgment of the trial court on the basis of the instructional error, the plaintiff's claim of evidentiary error—that the trial court improperly admitted Melendez' testimony regarding his estimation of the plaintiff's speed—need not be addressed. Nevertheless, because the issue could arise on retrial, I briefly address it.

The following standard of review and legal principles are relevant to the resolution of this claim. "Our standard of review regarding challenges to a trial court's evidentiary rulings is that these rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the [plaintiff] of substantial prejudice or injustice. . . . Additionally, it is well settled that even if the evidence was improperly admitted, the [plaintiff] must also establish that the ruling was harmful and likely to affect the result of the trial." (Internal quotation marks omitted.) *Bank of New York* v. *Savvidis*, 174 Conn. App. 843, 849, 165 A.3d 1266 (2017).

Pursuant to § 7-1 of the Connecticut Code of Evidence, "[i]f a witness is not testifying as an expert, the witness may not testify in the form of an opinion, *unless the opinion is rationally based on the perception of the witness* and is helpful to a clear understanding of the testimony of the witness or the determination of a fact in issue." (Emphasis added.) Thus, although our Supreme Court has stated that "lay witnesses are competent to offer opinions on such matters as the speed of an automobile . . . *they may only testify on the*

*basis of observed facts.*" (Citation omitted; emphasis added.) *Acampora* v. *Asselin*, 179 Conn. 425, 427, 426 A.2d 797 (1980).

Here, it is undisputed that Melendez had not seen the plaintiff riding down the hill toward the guardhouse; he had only observed the plaintiff at the moment his bicycle hit the second speed bump. Consequently, Melendez' opinion that the plaintiff had been traveling at approximately ten miles per hour had no basis in "observed facts." Indeed, his subsequent testimony makes clear that Melendez' opinion was not based on his actual perception of *the plaintiff* but on his estimation of how fast a *hypothetical person* traveling down the hill would have been going: "[I]f you were asking me if I knew how fast [the plaintiff] was going down that hill, I can't tell you that I saw him go down the hill. But because I work there, I know the incline of that hill, how steep it is. I could tell you approximately how fast *somebody* would be able to go down that hill on a bicycle." (Emphasis added.) Thus, the trial court erred in admitting Melendez' opinion testimony. Although it is unlikely that this error affected the result of the trial in light of Juliano's expert opinion testimony that the plaintiff had been traveling at approximately 9.8 miles per hour, this error should not be repeated in the event of a retrial.

In sum, I would reverse the judgment of the trial court and remand the case for a new trial. Accordingly, I respectfully dissent.

[1] In his request to charge, the plaintiff requested that the court instruct the jury that it was its responsibility to decide, on the basis of the evidence presented, whether the plaintiff was a licensee or a trespasser. Included in the plaintiff's requested charge was a proper statement of the legal definition of one who is a licensee and one who is a trespasser, and also a proper statement of the law regarding the duties owed by a possessor of land to a licensee and to a trespasser. On appeal, the plaintiff asserts that the court incorrectly charged the jury by instructing it solely with regard to the duties owed to a trespasser. From my perspective, this was a fatal error for either of two reasons. First, as is evident from the majority and dissenting opinions in this case, there was a sufficient factual dispute regarding the role of the guardhouse vis-à-vis visitors to the campus to render the question of the plaintiff's status a factual one for the jury's determination. Alternatively, if the court determined that the facts essential to the determination of the plaintiff's status were not in dispute, it should have charged only on the duties owed to a licensee. See *Millette* v. *Connecticut Post Ltd. Partnership*, 143 Conn. App. 62, 69 n.5, 70 A.3d 126 (2013) ("Ordinarily, the status of one who sustains injury while upon the property of another is a question of fact. . . . Where, however, the facts essential to the determination of the plaintiff's status are not in dispute, a legal question is presented." [Internal quotation marks omitted.]).

[2] The plaintiff and Lebov had been bicycle riding together on a regular basis over the course of twenty-five years, logging well over 20,000 miles.

[3] There was no evidence adduced at trial to suggest that the plaintiff and Lebov had decided to take the road to the right at the intersection in order to avoid the guardhouse at the entrance to the guarded road. Indeed, they both explicitly testified that they had not purposely avoided the guardhouse; rather, they chose to follow the route they had previously taken in order to pass by the wind farm. Moreover, the guardhouse straddling the road leading directly to the student dormitories did not appear to relate, in any way, to pedestrians, bicyclists, or those driving motor vehicles on campus who did not seek to travel on the guarded road.

[4] On the previous occasion, they had cycled into the campus and taken

the same road past the wind farm. On that occasion, they had circled around counterclockwise past the dormitories before leaving the campus via a rear access road. There had been no "no trespassing" signs, and the only gate along their route had been up.

[5] The plaintiff sustained a brain bleed and broke one of his femurs, a hip, and four ribs. He required surgery to repair his femur.

[6] The plaintiff also specifically alleged that he had been a business invitee of the defendant. After the parties presented their evidence at trial, however, the plaintiff's counsel conceded that a business invitee instruction was not warranted and, instead, requested an instruction on the duties owed by a land possessor to a licensee. Although the plaintiff had not alleged in the operative complaint that he had been a licensee, the defendant did not object to the plaintiff's requested instruction on that ground and the arguments presented by counsel to the court concerned only whether the evidence entitled the plaintiff to a charge related to the duties of care owed to a licensee.

[7] In addition to these specific claims made by the plaintiff, the court heard or saw documentary evidence that should have made it apparent that the guardhouse, about which there was a great deal of testimony, was not situated in a manner to guard the campus against trespassers but served, only, to limit and scrutinize vehicular traffic seeking access up the guarded road to the dormitory area. In my view of the record, testimony related to the guardhouse was minimally relevant to the issue of the plaintiff's status because the guardhouse was a substantial distance from the Sherman Avenue entrance to the campus, and its only apparent purpose was to screen vehicular traffic to the dormitory portion of the campus.

[8] "[W]here it is local custom for possessors of land to permit others to enter their land for particular purposes, it is immaterial that the particular person entering is not a member of the local community, or, if a member of the local community, is ignorant of the custom." 2 Restatement (First), supra, § 330, comment (e), p. 896.

[9] The majority asserts that there is no evidence in the record to indicate that the defendant had been aware of the plaintiff's presence when he rode through the campus the previous year. The majority is mistaken. Although there was no direct evidence of the defendant's awareness, Melendez, the public safety officer on duty at the time the plaintiff was injured, testified at trial that he had been able to see the plaintiff riding up the road toward the wind farm, and Barbara Barbuito, the assistant director of facilities for the campus, testified that the guardhouse is staffed at all times by public safety officers. Given this claim of constant surveillance, the jury reasonably could have inferred from this evidence that, in general, any bicyclist traveling up the road toward the wind farm would have been observed by whoever was then on duty at the guardhouse on this date or at any earlier time.

[10] This is not inconsistent with the observation in comment (b) to § 330 of the Restatement (First) of Torts that "[e]ven a failure to post a notice warning the public not to trespass cannot reasonably be construed as an expression of consent to the intrusions of persons *who habitually and notoriously disregard such notices*." (Emphasis added.) 2 Restatement (First), supra, § 330, comment (b), p. 894. The clear implication of this statement is that, in cases involving an entrant who does not habitually and notoriously disregard "no trespassing" signs, the absence of such signs may be a sufficient manifestation of consent to the entry.

[11] The majority contends that there is nothing in the record to support the conclusion that the "only apparent purpose of the guardhouse was to limit vehicular access" to the dormitory portion of the campus. For this contention, the majority relies on testimony from Melendez and Barbara Barbuito regarding their respective understandings of the purpose of the guardhouse, as well as testimony about a "verbal policy" regarding the entry of individuals onto the campus who are not affiliated with the defendant. See footnote 3 of the majority opinion. This reliance is misplaced. As previously noted, the decisive factor in determining the issue of a possessor's consent is the interpretation that a reasonable person would put upon the possessor's acts, not the possessor's unexpressed intentions or policies. In the present case, there is no evidence in the record to suggest that the views and policies expressed in Melendez' and Barbuito's testimony were made manifest. Consequently, this testimony is not relevant to the question of how a reasonable person in the plaintiff's position would have interpreted the surrounding circumstances.

[12] In making this assertion, I believe that the majority conflates the notion of notice with prevention. The turning point on whether an entrant is wel-

comed or is a trespasser is whether the entrant has fair notice. That can be provided, simply, with signs placed at the campus entrances. For example, in the case at hand, a sign stating the following would make clear that the campus is not generally open to the public: "The campus grounds are for the use of the Quinnipiac University community and invited guests. The public is welcomed to the campus only for events open to the public." If there had been such a sign at the Sherman Avenue entrance to the campus, it is likely that this case and the underlying injuries that befell the plaintiff would not have occurred.

[13] In my view, at the close of evidence, the court had two choices. If the court perceived that the evidence as to the plaintiff's status was controverted because of any ambiguity in the testimony of Melendez as to the scope of his duties, it could have instructed the jury that it was its task, as the fact finder, to determine whether the plaintiff was a trespasser or a licensee. If the court had made this choice, it would then have been appropriate for the court to provide the jury with detailed instructions on the definitions of "licensee" and "trespasser" with corresponding instructions on the duties owed by a possessor of land to a licensee and to a trespasser as requested by the plaintiff.

If, on the other hand, the court determined that the facts were not in dispute, it could have made a determination of the plaintiff's status as a matter of law. The court in the present case chose the latter course and concluded as a matter of law that the plaintiff had been a trespasser. For the reasons already noted, however, I believe that this determination was both erroneous and fatal to the plaintiff's opportunity to have his claim fairly adjudicated by the jury.

[14] Contrary to the majority's suggestion, the harmfulness of the trial court's error is not ameliorated by the fact that the court also instructed the jury regarding the duty owed to a constant trespasser. See footnote 11 of the majority opinion. The duty owed to a constant trespasser only arises when "[a] possessor of land . . . knows, or from facts within his knowledge should know, that trespassers constantly intrude upon a limited area thereof . . . ." (Internal quotation marks omitted.) *Morin* v. *Bell Court Condominium Assn., Inc.*, 223 Conn. 323, 333, 612 A.2d 1197 (1992). The majority does not dispute that there was no evidence adduced at trial that trespassers constantly intrude into the top of the campus. Therefore, to the extent that the majority implies that the court's constant trespasser instruction in some way negates the harm caused by the court's failure to instruct the jury with regard to the definition of and duties owed to a licensee, I respectfully disagree.

[15] Moreover, in asserting that the court's instruction, even if erroneous, caused the plaintiff no harm, the majority takes up an issue not raised or briefed by the appellee. As has been well established by our Supreme Court, it is improper for this court, on review, to decide a case on a basis not raised or briefed by a party on appeal. See *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 156 n.24, 84 A.3d 840 (2014) ("[W]e have long held that, in the absence of a question relating to subject matter jurisdiction, the [reviewing] [c]ourt may not reach out and decide a case before it on a basis that the parties never have raised or briefed. . . . To do otherwise would [unfairly] deprive the parties of an opportunity to present arguments regarding those issues." [Internal quotation marks omitted.]).